282 N.J. Super. 23 (1995)
659 A.2d 482
WILLIAM SNYDER AND ROSLYN SNYDER, PLAINTIFFS-RESPONDENTS,
v.
AMERICAN ASSOCIATION OF BLOOD BANKS, DEFENDANT-APPELLANT, AND HAROUTUNE MEKHJIAN, M.D., INDIVIDUALLY, AND HAROUTUNE MEKHJIAN, M.D., P.C.; YOUNGICK LEE, M.D.; WILMO OREJOLA, M.D.; ANTHONY LOSARDO, M.D.; LEONARD SAVINO, M.D.; JOHN DOE, M.D., A FICTITIOUS NAME; RICHARD ROE, M.D., A FICTITIOUS NAME; JOHN ROE, M.D., A FICTITIOUS NAME; JOHN SMITH, M.D., A FICTITIOUS NAME; JOHN JONES, M.D., A FICTITIOUS NAME; ST. JOSEPH'S HOSPITAL; ST. JOSEPH'S BLOOD BANK; BERGEN COMMUNITY BLOOD CENTER; ANTHONY PASSARO; LAWRENCE WILKINSON; W BLOOD BANK, A FICTITIOUS NAME; DR. JOHN KALIAN; Y BLOOD BANK, A FICTITIOUS NAME; Z BLOOD BANK, A FICTITIOUS NAME; XYZ BLOOD BANK, A FICTITIOUS NAME; JANE DOE, A FICTITIOUS NAME; RICHARD ROE, A FICTITIOUS NAME; JOSEPH WILLIAMS, A FICTITIOUS NAME; GREGORY SMITH, A FICTITIOUS NAME; JOSEPH SMITH, A FICTITIOUS NAME; JANE SMITH, A FICTITIOUS NAME; WILLIAM SMITH, A FICTITIOUS NAME; INDIVIDUALLY AND AS AGENTS, EMPLOYEES AND SERVANTS OF ST. JOSEPH'S HOSPITAL, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 2, 1995.
Decided June 5, 1995.
*28 Before Judges PRESSLER, CONLEY and NEWMAN.
Edwin R. Matthews argued the cause for appellant (Matthews White Giacumbo & Fischer, attorneys; Mr. Matthews and Drew D. Krause, on the briefs); co-counsel Budd Larner Gross Rosenbaum Greenberg & Sade (Mark D. Larner, Donald P. Jacobs and Vincent J. Proto, of counsel).
George T. Baxter argued the cause for respondents.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
In August 1984 plaintiff William Snyder underwent coronary bypass surgery at St. Joseph's Hospital in Paterson, New Jersey. As a result of being transfused with contaminated blood supplied to the hospital by the Bergen Community Blood Center (BCBC), he was infected with the AIDS virus (HIV). He and his wife Roslyn, who sues per quod, brought this action against, among others, the hospital, his physicians, the BCBC and its personnel, and the American Association of Blood Banks (AABB), of which BCBC is an institutional member. Following pretrial settlements with some defendants and dismissals of others, trial proceeded only against defendant AABB. The jury, by way of its answers to special interrogatories, found that the AABB was negligent in not having recommended surrogate testing for AIDS to its institutional members prior to August 1984. The jury further found that that negligence substantially enhanced plaintiff's risk of contracting AIDS by transfusion and constituted a thirty percent causative factor in his having actually contracted the disease. Finally, the jury found that plaintiff's total damages were $1,000,000 and his *29 wife's $350,000. Judgment was accordingly entered in their favor in the amount of thirty percent of total damages, a total of $405,000, plus prejudgment interest. Defendant appeals. We affirm.
The factual, procedural, and legal background of this 1994 trial is described in our first opinion in this case, Snyder v. Mekhjian, 244 N.J. Super. 281, 582 A.2d 307 (App.Div. 1990), affirmed o.b., 125 N.J. 328, 593 A.2d 318 (1991) [Snyder I]. The two issues then directly before us, which we considered on leave to appeal from pretrial orders, were first, whether a cause of action lay in strict liability, and second, whether plaintiff had at least a qualified right to discovery from the donor of the contaminated blood by which he was infected to determine whether its screening, collection, and transmission to the hospital were in any way negligent. We answered the first question in the negative and the second in the affirmative. In dealing with the second, we recognized that the issue of discovery was, obviously, pertinent only if there were in fact a viable cause of action in negligence against the then remaining defendants. This is what we said:
There is certainly enough in this record to raise a factual question as to the reasonableness of AABB's conduct in opting to forego guidelines which would have required its members to perform surrogate laboratory testing or more vigorous donor screening. There is also a factual question as to BCBC's conduct in collecting blood without these techniques, irrespective of AABB's guidelines. If it were determined that the conduct of either BCBC or AABB, or both, unreasonably created an appreciable enhancement of plaintiff's risk and that the enhanced risk was a substantial factor in producing his injury, they would be liable to him in negligence even though he might have contracted AIDS even if they had taken every available precaution.
[244 N.J. Super. at 293, 582 A.2d 307].
We then remanded for trial, which proceeded on that theory of negligence.
In substantial measure the proofs adduced at trial supported the facts we had recited in Snyder I, 244 N.J. Super. at 287-289, 582 A.2d 307, which we had culled from the motion record then before us. Those proofs dealt with AABB's internal structure, its general role in the blood-banking industry, and its specific role in determining the response of the voluntary blood-banking community *30 to the AIDS threat between 1981, when the first AIDS cases were reported by the Centers for Disease Control (CDC), and March 1985, when the first test for HIV was in place.
Both parties relied on the testimony of distinguished experts, most of whom were involved during the critical time period either in AIDS research, AIDS epidemiology, AIDS treatment, or blood-banking on the highest levels. From their testimony, the following history of those years emerges. The CDC, an agency of the federal Public Health Service, publishes a weekly document, the Morbidity and Mortality Weekly Report (MMWR), which is widely disseminated to the medical and scientific community. The MMWR of June 5, 1981, reported five cases of pneumocystis pneumonia among young homosexual men in Los Angeles. The MMWR of July 4, 1981, reported cases of Kaposi's sarcoma among twenty-six young homosexual men, twenty in New York and six in California, as well as ten new cases of pneumocystis pneumonia among young homosexual men, four more in Los Angeles and six in San Francisco. Both diseases, theretofore rare and generally occurring in elderly patients, are associated with immunosuppression. By August 28, 1981, the MMWR reported an additional seventy cases of these two diseases among the same population. Occurrence of the syndrome was doubling every six months. By June 1982, it had become clear that a new immuno-deficiency disease of epidemic proportion affecting homosexual men had emerged involving not only pneumocystis pneumonia and Kaposi's sarcoma, but also a variety of other opportunistic infections generally associated with immune-system suppression including lymphopathy, candida infections, adult thrush, and cryptococcal meningitis. Three hundred and fifty cases of this new disease, originally termed GRIDS (gay-related immune deficiency syndrome), were reported, primarily in California, New York, New Jersey, Florida and Texas, and primarily among young homosexual men, although cases were also reported among IV drug users and Haitians, particularly recent immigrants. Although the cause of the disease and its actual mode of transmission were still unknown, the MMWR of July 16, 1982, raised a red flag by reporting three *31 cases of the disease among hemophiliac men who had no other risk factors. This is what the MMWR said:
The clinical and immunologic features these three patients share are strikingly similar to those recently observed among certain individuals from the following groups: homosexual males, heterosexuals who abuse IV drugs, and Haitians who recently entered the United States. Although the cause of the severe immune dysfunction is unknown, the occurrence among the three hemophiliac cases suggests the possible transmission of an agent through blood products.
At least from that time forward, the CDC and others working in the field assumed as a working hypothesis that AIDS was caused by a blood-transmissible infectious agent. Indeed, Dr. Luc Montagnier, a virologist at the Pasteur Institute in France who testified at trial, relied in large part on the CDC information in formulating his working hypotheses, and believed that he had isolated and identified the retrovirus causing AIDS in January 1983. He was certain of that result in the spring of that year. In any event, from the point of view of CDC, the assumption that AIDS was caused by a blood-transmissible virus became a matter of high probability when it reported, in December 1982, that an infant had died of AIDS in California after having been transfused at birth with blood from a donor who had himself subsequently died of AIDS.
The CDC regarded that piece of information as so critical in terms of protection of the nation's blood supply that it called an emergency workshop meeting in Atlanta for January 4, 1983, attended by many of the scientists and physicians responsible for formulating and implementing the nation's blood supply policy, including, among others, representatives of government, the AABB, the National Hemophilia Foundation, and the National Gay Task Force. By that time the CDC had an AIDS Task Force in place consisting of CDC scientists who had special expertise in various facets of the disease. They included Dr. Donald Francis, an expert in hepatitis B among homosexual men, who testified at trial by way of videotaped deposition; Drs. Curran and Jaffe, experts in sexually transmitted diseases; and Drs. Spira and Evatt, experts in hemophilia. The Task Force was convinced that AIDS was blood-transmissible. It was also convinced that epidemiologically *32 the disease mirrored hepatitis B, involving exactly the same high-risk groups and in the same proportions. What came to be known as the Spira data, presented at the meeting, showed that among those patients having AIDS, about ninety percent of gay men, one hundred percent of IV drug users, and ninety-eight percent of Haitians also tested positive on the hepatitis B core antibody test (core test). The data also asserted that seventy-nine percent of all homosexual and bisexual men would have positive core tests as against five percent in the balance of the apparently healthy population. The recommendation of these physicians was that all persons belonging to the high-risk groups should be screened out of the blood-donation system. Three modes of screening were recommended: direct questioning of prospective donors to determine if they belonged to a high-risk group; careful taking of medical histories from donors including questions regarding such early AIDS symptoms as night sweats and weight loss; and, most significantly, surrogate testing. That is to say, since the AIDS-causing agent had not yet been identified, the effort was to find a test of both high sensitivity and high specificity that would enable identification of persons suffering from or at risk of AIDS. At least three such surrogate tests were suggested: the core test, a lymphocyte count test, and a T4/T8 cell test. Since the T4/T8 cell test required sophisticated equipment and specially trained personnel and the lymphocyte test appeared to lack adequate specificity, the core test appeared most promising.
As testified to by those of the witnesses at trial who attended the January 4, 1983, meeting, it was highly emotional, contentious, and fractious. According to plaintiff's witnesses, the chief source of obstruction was the blood bankers and particularly AABB's representative, the chairman of its Transfusion-Transmitted Disease Committee, who declined to subscribe to the view of a blood-transmissible infectious agent as the cause of AIDS.[1] Accordingly *33 *34 no real consensus and no recommendations immediately resulted. The meeting, however, marked a turning point in the saga of the nation's blood supply over the next two years. A few blood bankers then acted in accordance with the CDC's views in respect of surrogate testing. Most, including the AABB and almost all of its institutional members, the American Red Cross, and the Council of Community Blood Banks did not. According to plaintiff's experts, reasonably prompt action by the AABB following the January 4, 1983, meeting would have significantly promoted the safety of the blood supply and saved it from much of its consequent contamination.
Thus in January 1983, Dr. Thomas Asher, the operator of a substantial commercial blood fractionating facility, instituted total lymphocyte testing, rejecting all blood under a 1500 count. No case of AIDS, he testified, resulted from any blood so collected, tested, and distributed by his company. Dr. Edward Engleman, chief of the Stanford University Hospital blood bank, instituted T-cell testing, and by the beginning of 1984, refused to accept supplemental blood from other sources that had not been either T-Cell or core tested. A group of voluntary blood banks in northern California instituted core testing early in 1984. Most of the rest of the blood-supply collectors, however, followed the AABB recommendation not to implement surrogate testing or direct questioning of donors, but only to implement donor self-deferral based on a written brochure explaining the high-risk groups. The heart of plaintiff's case against the AABB is the opinion of his experts, including Dr. Francis, Dr. Engleman, Dr. Asher and Dr. Marcus Conant, that the AABB's failure to have *35 recommended surrogate testing to its institutional members, as well as its affirmative recommendation not to so test was, based on what it then knew and understood, unreasonable, imprudent, and, in the end, negligent.[2]
We review the evidence of the AABB's course of action following the January CDC meeting in the context of the proofs, virtually undisputed, of its position in American blood banking. To begin with, the AABB is a non-profit corporation organized in 1947 under the laws of Illinois. Its certificate of incorporation describes it as "a trade association of local and regional blood banks" whose purposes, among others, are to "foster the exchange of ideas and information" relating to blood banks and transfusion services, to promote standards of performance and service by blood banks, to "function as a clearing house" for the exchange of blood and blood-credits, to encourage the development of blood banks, and to "plan for cooperation amongst blood banks at times of disaster."
Those statements may well understate its actual influence and preeminence in the voluntary blood-banking industry. According to the evidence, its institutional membership includes almost every voluntary blood bank in the country, nearly 2,400 in 1992. In that year, its individual membership, extended primarily to physicians and scientists, numbered in excess of 9,000. The AABB publishes a periodically updated technical manual, entitled "Standards for Blood Banks and Transfusion Services," covering all aspects of blood banking, including donor screening and blood testing, with which its institutional members are required to comply. It inspects and accredits its members' facilities. Some states defer *36 entirely to AABB inspection and accreditation. Others, like New Jersey, defer only in some respects.[3] It is clear that its role in prescribing procedures and policies for the conduct of voluntary blood banks is quasi-governmental. Indeed, the testimony from the BCBC officials was that had surrogate testing been recommended by the AABB, even if not required, the BCBC surely would have done so. Consequently, plaintiff's experts directly attributed the almost total failure of the American voluntary blood banks to engage in any surrogate testing to the AABB's failure to make such a recommendation and its recommendation that such testing not be done.
We note further that the AABB was also described by several of the expert witnesses as inordinately influential in setting national blood policy in the first half of the 1980's, a primary responsibility of the FDA, by reason of AABB's participation in the FDA's Blood Products Advisory Council and other agencies, councils, and committees charged with formulating national blood policy, and by reason, apparently, of its acknowledged expertise. Indeed, the Report of the Presidential Commission on the Human Immunodeficiency Virus Epidemic (June 1988) (HIV Report) concluded *37 that one of the obstacles to progress during the early years of the epidemic was the extent of governmental deference to industry views. The HIV Report states:
The Food and Drug Administration (FDA) has the responsibility to set the standards for the blood industry; however, it relies heavily on that industry for advice on what standards to set  a relationship that presents a significant opportunity for conflicts of interest to arise.
[Id. at 78].
Finally, the evidence shows that AABB is an effective lobbyer for the perceived interests of the blood-banking community.[4] Certainly the evidence permits the inference that the AABB is the national blood-banking establishment. It has written the rules. It has set the standards. It speaks for it.
Against this background, we consider the evidence of the AABB's response to the CDC Task Force's January 4, 1983, presentation. We note first that the Chairman of its Transfusion-Transmitted Disease Committee certainly acknowledged in private communications and internal memoranda to the AABB Board his belief, even before the January 4, 1983, meeting that AIDS was caused by a blood-transmissible agent, a belief most experts had come to share when the hemophiliac cases were reported the previous July. The early public statements of AABB however, notably those it made jointly with the American Red Cross and the Council of Community Blood Centers, were at best equivocal. Thus, the joint statement of January 13, 1983, stressed that the "possibility" that AIDS was spread by "blood borne transmission" *38 was "still unproven" and that "[e]vidence of transmission by blood transfusion is inconclusive." Nevertheless, because of the possibility, the joint statement recommended caution in the use of blood products and "reasonable attempts to limit blood donation from individuals or groups that may have an unacceptably high risk of AIDS." Laboratory screening was specifically not recommended.
That joint statement set the tone for the AABB's position even after Dr. Montagnier's work was duplicated in this country by Dr. Robert Gallo in the spring of 1984 and continuing until a specific AIDS test was in place in the spring of 1985. In short, it continued to recommend against surrogate testing, direct questioning of donors, and directed donations. The AABB followed this cautious route despite CDC's publication in March 1983 of a variety of recommendations based on data supporting blood transmissibility and detailing the extent of the occurrence of AIDS among the four identified high-risk groups. Apparently because of conflicts among the separate agencies and offices of the Public Health Service, the March publication did not recommend specific surrogate testing, but did recommend that laboratory screening procedures continue to be evaluated for effectiveness in identifying high-risk blood and that "careful histories and physical examinations" attend the donor screening process. Evaluation of the core test was undertaken by the Blood Products Advisory Committee, which issued majority and minority reports in 1984.
The general tenor of the evidence as a whole justifies the inference that every responsible expert in the United States was convinced well before the end of 1983, and most before the end of 1982, that AIDS was caused by an infectious, blood-transmitted agent. A New England Journal of Medicine article published in January 1984 was regarded by the medical community as entirely persuasive. The AABB nevertheless continued to express skepticism until Dr. Gallo's work was announced and even then, although it conceded the dangers posed by the high-risk groups, it resisted surrogate testing and direct questioning, procedures that, according to the HIV Report, supra, at 78, are now matters of *39 standard operating procedure in the protection of the blood supply.
The testimony of AABB's impressive array of experts in blood banking, most of whom hold or have held important positions in the AABB, supported its approach during the critical time period. Foremost among their reasons was their opinion that no then available surrogate test, and certainly not the core test, was effective in identifying substantial numbers of persons at risk of AIDS, i.e., that the tests lacked adequate sensitivity, and that the surrogate tests would result in an untoward percentage of false positives requiring the deferral of too many healthy donors and the consequent diminution of the blood supply, i.e., that the tests lacked adequate specificity. The core test itself had not yet, as of 1985, been licensed by the FDA for diagnostic purposes although plaintiff's experts were satisfied that that fact did not impinge on the usability of the test for blood-screening purposes. Defendant's experts were also concerned with the bioethical problem of what to tell prospective donors who tested positive on the core test vis-a-vis the possibility of their having AIDS.[5] They were concerned about creating panic. They were concerned with at-risk persons coming to blood banks for the sole purpose of being tested for the possibility of AIDS. The risk of transfusion-related AIDS was apparently underestimated.[6] There was some belief that self-deferral *40 was "working." There were tensions created by the gay politics of the time. Defendant's experts consequently took the position that the blood supply was best protected by not implementing surrogate testing during the critical period.
The question that this jury had to resolve, based on the sharply conflicting expert testimony, was whether AABB, the policy-setter, knowing what it knew from 1981 to 1985, had made a reasonable and prudent decision in recommending to its 2,400 institutional members that they not conduct surrogate testing of blood in order to help identify prospective donors belonging to high-risk groups. The HIV Report, supra, at 78, concludes that "[t]he initial response of the nation's blood banking industry to the possibility of contamination of the nation's blood by a new infectious agent was unnecessarily slow." The evidence at this trial supports the jury's finding that the response was not only "unnecessarily slow" but also that it was clearly imprudent and unreasonable, resulting in unnecessary contamination of the blood supply.
Turning from the broad issues implicated and explicated at this trial to the specific situation of plaintiff, we note the following evidence. In Snyder I, we permitted confidential discovery under court supervision of the HIV-infected donor whose blood resulted in plaintiff's contraction of AIDS. That discovery took place. Insofar as relevant to the surrogate testing issue with which we must be exclusively concerned because of the jury's verdict, this much is plain. That donor tested positive on the hepatitis B core test in 1994. Plaintiff's experts concluded, based on the characteristic relationship between the occurrences of hepatitis B and AIDS in homosexual men, that the donor, as a matter of reasonable medical probability, would also have tested positive ten years *41 earlier. Defendant's experts disputed that opinion. But clearly then, there was adequate evidence in this record to support the finding that had the core test been recommended by AABB for use at any time up to the middle of 1984, BCBC would have been using it and this donor's blood would have been deferred.
We consider AABB's legal challenges to the jury verdict in the context of this factual recitation. First, it argues that the trial court erred in denying its motion for summary judgment based on the assertion of its right to charitable immunity pursuant to N.J.S.A. 2A:53A-7. We think it plain from what we have already said that AABB, although it is a non-profit corporation engaged in necessary and useful services, is not "organized exclusively for religious, charitable, educational or hospital purposes...."
At the outset, we accept, for the reasons there stated, Judge Imbriani's conclusion in Jacobs v. North Jersey Blood Ctr., 172 N.J. Super. 159, 411 A.2d 210 (Law Div. 1979), that the statutory charitable immunity does not apply to voluntary non-profit blood banks. In sum, the voluntary blood banks deal with a product paid for by its recipients without regard to their individual financial need. The need of all recipients for the product is the same, the voluntary blood banks are the major suppliers of that product, and the charges by the blood banks make no distinction between rich and poor. They are not charities by any accepted definition of that term. We are also satisfied that the Legislature so perceived when it adopted N.J.S.A. 2A:53A-7.2, expressly responsive to Jacobs. That statute provides, in relevant part, that
no person serving without compensation, other than reimbursement for actual expenses, as a trustee, director, officer or voluntary member of a nonprofit blood bank shall be liable for damages resulting from the exercise of judgment or discretion in connection with the duties of his office unless the actions evidence a reckless disregard for the duties imposed by the position.
Clearly, then, the Legislature was aware of the non-immunity holding of Jacobs. It had the option of overruling it entirely. It did not. Rather, it granted immunity only to individual unpaid officers for ordinary negligence and not to the blood bank itself. We regard N.J.S.A. 2A:53A-7.2 as confirming, therefore, the *42 general liability of the blood banks for ordinary negligence. See, e.g., Monaghan v. Holy Trinity Church, 275 N.J. Super. 594, 602-603, 646 A.2d 1130 (App.Div. 1994), reaffirming the principle that when the Legislature, assumed to be familiar with both its own enactments and judicial constructions thereof, amends a statute without affecting a prior construction, it must be deemed to have approved of the judicial interpretation.
The issue then is whether, if the voluntary blood banks themselves are not entitled to charitable immunity under N.J.S.A. 2A:53-7, their trade association is. We think the answer to this question is also plain. While some of AABB's activities may be charitable and educational, those are not its exclusive purposes. It performs a critical governance function in respect of the operation of blood banks. That is to say, it tells the voluntary blood banks exactly how to screen, obtain, and distribute blood. It inspects and accredits them. Its inspection, accrediting, and standard-setting are governmental  not charitable  functions to which many states have in varying degrees deferred. It performs political lobbying functions to promote the interests of its institutional and individual members, including lobbying on so-called tort-reform issues. Its operations are primarily financed by dues and fees. Its educational mission is not publicly oriented but for the benefit of its members. It exercises substantial control over the adequacy and the integrity of the nation's blood supply and is directly involved in formulating industry policy.
As we explained in Parker v. St. Stephen's Urban Dev., 243 N.J. Super. 317, 324-325, 579 A.2d 360 (App.Div. 1990):
Further, the performance of useful service does not per se compel the corollary that a corporation meets the standard for charitable immunity. What is required is an examination of the entity seeking to clothe itself in the veil of charitable immunity to discover its aims, its origins, and its method of operation in order to determine whether its dominant motive is charity or some other form of enterprise. When such an examination is undertaken in this case, the conclusion that defendant is not "organized exclusively for ... charitable ... purposes" is inevitable. (Citation omitted.)
So here. The AABB is a distinguished, multi-faceted, professional enterprise, which has undoubtedly made contributions of the *43 highest order in providing and maintaining the nation's blood supply. But it is not primarily either a charity or an educational enterprise or a combination of these two. It is responsible, without the shield of charitable immunity, for its acts of ordinary negligence.
AABB next argues that it did not owe plaintiff a duty of care. We agree with the perception of plaintiff and the trial judge that we already decided that issue in plaintiff's favor in Snyder I and that the doctrine of law of the case applies to that decision. See, e.g., Lanzet v. Greenberg, 126 N.J. 168, 192, 594 A.2d 1309 (1991). We add, however, the following. In view of the role the AABB plays in the governance of volunteer blood banks, in view of the evidence of the deference by the local blood banks to AABB's recommendations as well as to its standards, and in view of the evidence that BCBC routinely follows AABB recommendations and would have done so here in respect of surrogate testing, we regard the argument as sophistical. The central mission of the blood-banking industry is to provide blood and blood products to people in need of them. The AABB's raison d'etre is to assure that the recipients of blood supplied by its institutional members receive as safe a product as is reasonably practical. It adopts standards and makes recommendations with the intent and expectation that their institutional members follow them and to that end it retains the power to impose punitive measures upon members who consistently fail to do so.
As we have been recently reminded by the Supreme Court in Strachan v. John F. Kennedy Memorial Hosp., 109 N.J. 523, 529, 538 A.2d 346 (1988), the question of whether one owes a duty to another is "largely a question of fairness or policy" whose resolution requires the "`weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.'" The unique and dominant role of AABB in blood-banking and the extent of its control over its institutional members create the requisite relationship between it and the ultimate recipient whose safety is its avowed paramount concern. Considering *44 further the nature and degree of the risk and the public policy concerns implicit in the blood-banking industry's methods of operation, we are satisfied that AABB is reasonably chargeable with a duty of care owed to those recipients whose life and health depend on the reasonableness and prudence of its actions. See, e.g., arguing for AABB liability to transfusion-related AIDS victims, Eckert, supra, 29 San Diego L.Rev. 203; Dorney, Comment, supra, 3 J.Pharm. & Law 129. We agree with the trial judge that the considerations underlying Meyers v. Donnatacci, 220 N.J. Super. 73, 531 A.2d 398 (Law Div. 1987), relied on by defendant and involving a swimming pool trade association, are entirely inapposite.
We also reject AABB's proximate cause arguments, namely that the enhanced-risk theory was inapplicable to plaintiff's claims and that its not having recommended surrogate testing did not increase plaintiff's risk. As to the first of these issues, we are satisfied that the judge's charge adequately complied with the enhanced-risk principles of Ayers v. Jackson Tp., 106 N.J. 557, 591-599, 525 A.2d 287 (1987), and Evers v. Dollinger, 95 N.J. 399, 417, 471 A.2d 405 (1984). See also Restatement (Second) of Torts § 323. As a legal proposition, we also believe that our decision in Snyder I resolved the proximate cause issue in plaintiff's favor and that the law of the case doctrine consequently applies. Beyond that, enhancement of the risk was the obviously applicable and relevant doctrine here. The absolute safety of blood, as we pointed out in Snyder I, cannot be guaranteed. Some risk continues to inhere. Despite present AIDS testing, the risk of transmitted AIDS infection also continues to inhere, albeit minimally. The question before the jury was whether the risk that plaintiff would be infected by HIV in August 1984 was enhanced because BCBC did not perform core testing as a surrogate test for AIDS and whether BCBC's failure to do so was directly attributable to AABB's recommendation or, more accurately, non-recommendation, to its institutional members. The *45 evidence supported an affirmative answer to this question and the jury so found.
Defendant's argument, however, requires some further factual focus on the evidence respecting the efficacy of the core test. As we have already pointed out, there was conflicting expert testimony respecting its sensitivity and specificity. The jury was free to accept plaintiff's experts' view that core testing would have eliminated a substantial percentage of HIV-contaminated blood from the supply and at the same time would have resulted in the loss of no more than five percent of the supply. Defendant's rebuttal of this evidence included not only the FDA licensing issue to which we have referred and other studies indicating less sensitivity than claimed by plaintiff, but also concentrated on the etiological distinctions between AIDS and hepatitis B. To this end, defendant produced Dr. Montagnier to testify that the infectious agents causing the two diseases are entirely unrelated to each other as are the diseases themselves. This is of course true, virologically speaking. But that misses the point of the usefulness of the core test as a surrogate test for AIDS. The conclusion of the CDC scientists was that hepatitis B and AIDS are caused by infectious agents transmitted in the same manner among persons of the same behavioral patterns. The lifestyle choices placing people at risk of hepatitis B are precisely the same lifestyle choices placing them at risk of AIDS. Consequently, persons who had already contracted hepatitis B had, as a group, a high AIDS risk, and if those persons could be screened out of the blood-donating process, the risk of transfusion-caused AIDS would be correspondingly reduced even though the cost would be the rejection of some good blood. CDC data supported that conclusion. The identity of the risk groups for the two diseases was never seriously questioned. There was evidence that the donor who caused plaintiff's disease would have been screened out had BCBC performed core surrogate testing and although it did not, it would have had AABB so recommended. Proximate cause was proved.
*46 Defendant raises a number of evidential challenges, none of which, we are satisfied, requires reversal. It complains of the admission, over its objection, of evidence of AABB's recommendation to its institutional members in 1986 to do hepatitis B core testing as a surrogate test for non-A, non-B hepatitis. AABB's position is that that recommendation constitutes proof of subsequently taken remedial action inadmissible pursuant to N.J.R.E. 407. This is not so. By its terms, N.J.R.E. 407 does not permit evidence of subsequent remedial action to be admitted to prove culpability for the prior event. It permits such evidence, however, "as to other issues." See, e.g., Kane v. Hartz Mountain Indus., 278 N.J. Super. 129, 148, 650 A.2d 808 (App.Div. 1994). See generally Biunno, Current N.J.Rules of Evidence, comment 1 on N.J.R.E. 407. The evidence was not proffered here as proof of culpability prior to August 1984, but for a quite different and more limited purpose, namely to rebut the testimony of some of defendant's experts that screening out blood that tested positive for hepatitis B would endanger the total blood supply by depriving it of beneficial hepatitis B antibodies. Beyond that, the use of the hepatitis B core test as a surrogate for non-A, non-B hepatitis is not remedial action subsequently taken in respect of surrogate testing for HIV since by the time AABB recommended core testing as a surrogate test for non-A, non-B hepatitis, the specific HIV test was already in place.
Nor do we find error in the trial judge's overruling of defendant's objection to the playing to the jury of a short segment of a 1986 "20/20" television program in which one of defendant's experts was interviewed and appeared to espouse views favoring hepatitis B surrogate testing as early as 1983. Those views were at significant variance with his trial testimony.[7] We agree with *47 the trial judge that since the interviewee was a qualified and testifying expert witness, prior inconsistent statements made by him were admissible to impeach his credibility and he was, in any event, available to explain any contextual or other distortions. The ruling and its reasons were entirely unexceptionable. We reach the same conclusion with respect to the trial judge's ruling that barred Dr. Montagnier from testifying about the unpublished Spira data to which we have already referred. Dr. Montagnier had no first-hand knowledge of that data  it had been supplied to him by an attorney  and virology, not epidemiology, was his field of preeminent expertise. The trial court did not mistakenly exercise its discretion in barring that area of testimony.[8] Finally, we are satisfied that the trial judge did not mistakenly exercise his discretion in admitting an American Red Cross memorandum *48 written in February 1983 suggesting conspiratorial action between the Red Cross and AABB in concealing from the public the import of the known AIDS data, its likely blood-transmissibility, and the risk of transfusion-caused AIDS. The trial judge relied on N.J.R.E. 803(b)(5) (statements made in furtherance of a plan to commit a civil wrong), and we affirm the ruling for the reasons stated by him.
We address briefly defendant's remaining contentions which we are satisfied are without merit. R. 2:11-3(e)(1)(E).
We reject AABB's contention that the allocation of fault issue was incorrectly handled by the trial judge both as a matter of proof and as a matter of charge. This was an enhancement of the risk case, and all that was in issue in this trial was the extent to which, if at all, AABB's own conduct  not anyone else's  unreasonably enhanced the risk. The manner in which the case was tried and the instructions to the jury made it clear that AABB could be held chargeable only for its own acts of negligence and only to the extent to which those acts were actually found to have enhanced plaintiff's risk of transfusion-caused AIDS. The jury's verdict confirms its understanding of what it was required to do.
We reject AABB's contention that the judge responded inadequately to potentially prejudicial stories that appeared once in two local newspapers during trial. The trial judge, when the stories were brought to his attention, was of the view that the better approach was to rely on the general instructions to disregard newspaper articles. That was a reasonable response under the circumstances. See generally State v. Bey, 112 N.J. 45, 83-86, 548 A.2d 846 (1988).
We reject defendant's contention that the judge erred in reading a portion of N.J.S.A. 26:5C-2 to the jury during the charge. N.J.S.A. 2C:5C-1 to -4, entitled the "AIDS Assistance Act," was adopted effective August 8, 1984. N.J.S.A. 26:5C-2, stating the legislative findings, refers to AIDS as caused by a blood-transmissible virus, as affecting the four known high-risk *49 groups, and as requiring community response by way of public programs fostering diagnosis, and treatment. The trial judge instructed the jury that it could consider the statute, particularly its date, in determining defendant's negligence. Defendant objected on several grounds. Its objection was overruled. For the first time on appeal it argues that the charge was incorrect because the legislative findings are not relevant in evaluating defendant's conduct. Because this objection was not raised below, it is subject to the plain error standard. See, e.g., Rendine v. Pantzer, 276 N.J. Super. 398, 431-432, 648 A.2d 223 (App.Div.), certif. granted, 138 N.J. 272, 649 A.2d 1291 (1994). We are satisfied that not only was the reading of the statute not plain error, but that it was not error at all. The statute was the proper subject of judicial notice. See N.J.R.E. 201(a). Since AABB was demonstrated to be at the forefront of scientific developments affecting the blood supply and its potential contaminants, the import of the jury charge was appropriate and consistent with the evidence.
Defendant argues that the trial judge erred in denying its motion for a new trial on the issue of surrogate testing based on the weight of the evidence. We are convinced, in view of the evidence on that issue which we have already recited, that the proofs as a whole were adequate to support the jury's finding.
Defendant's final argument is that it was prejudiced by the aggregation of errors if not by any one error. We have found no reversible error, either individually or in the aggregate. We make this further observation. The original trial judge, Judge Van Tassel, died during the trial. Judge Stark completed it upon her review of the transcripts. A complex matter was thus made even more difficult for the trial court and the litigants, and both judges responded commendably to the situations they respectively faced.
In reviewing the sorry history of this nation's response to the AIDS epidemic during its first three years, and particularly the contamination of the blood supply by HIV that could have been avoided, Dr. Francis opined that there was enough blame to go *50 around. We are persuaded that plaintiff adequately proved the portion of blame fairly attributable to AABB.
The judgment appealed from is affirmed.
NOTES
[1] The meeting was described by Dr. Francis as follows:

The reactions of the blood bankers led, really, by the representative Dr. Bove, from the AABB, with, I guess the most vocal support from Dr. Kellner from the New York Blood Center, was remarkably obstructive. This was a difficult meeting for us, this was a meeting that we thought was worthy of a great deal of importance, that in a public health sense we had a threat and that action, immediate action needed to be taken because of this threat.
The obstruction from Dr. Bove and the other blood bankers there were basically an attempt to deny that there was a threat, disbelief in the CDC information and obstruction to this momentum that we were building, defining the problem and then ultimately trying to move to a solution, that the blood bankers were not part of this momentum that we were building.
There was a resistance to recognizing the problem and, therefore, to make a solution.
* * *
I don't think I got over, completely, the force at which we recommended this and the reaction of the blood banks and the then counter measures that I, at least, used at that meeting to try to bring them into focus of the seriousness of their decisions not to act.
That the reluctance and the inertia that we at CDC faced with the blood banks in that meeting was so, at least in my end, others at CDC's opinion was so ridiculous and so alarming that it got to the point of me literally pounding on the table and shouting to these individuals as to how many deaths it's going to take before you will act.
And I was saying, do you need ten, do you need twenty, do you need forty, when we get to that level, then are you going to act?
This was a very heated meeting because of this incredible counter balance of those of us investigating the epidemic and seeing the urgency of the situation, versus  and wanting to put the responsibility for action onto the blood banks, because presumably, they were the only ones that could act, that there  the imbalance of this urgency from us and the obstruction, the negative response from them was a most disturbing time, one of the most disturbing times in my twenty years in public health.
* * *
The  much of the discussion was centered around our recommendations at CDC for action and that action was designed to exclude high risk donors, specially gay men, as we discussed interviewing and deferring donors and using anti-core testing.
Since most of the discussion was supposed to be centered around that, and dealing with the action issues of what's the best way to implement prevention programs in the way that is least costly and most efficient and practical for blood banks, that we were recommending  that we kept hitting this wall of saying, you haven't shown us that AIDS is transmitted by blood, despite there being intravenous drug users infected, besides there being plasma recipients infected, and there was some Alice in Wonderland thought that just because plasma, just because people are sharing needles get it, that people who receive blood did not, which makes no sense, obviously, in a scientific way.
The  this obstruction, then, of, was there a, you know, was there such a thing as transfusion associated AIDS, if there wasn't such a thing, then there was no action that was necessary, we were saying, one there's a two  a thing and, two, we need to act appropriately.
And this, the initial negativism, accepting such a thing as transfusion associated AIDS, and then the real hostility towards moving ahead and doing something, saying it was going to cost too much, it was going to cause too much trouble, was just a most unfortunate expression of AABB policy.
[2] Plaintiff urged two other theories of negligence, namely, AABB's failure to recommend direct questioning of donors and AABB's failure to recommend directed donations, that is, permitting a patient needing blood to designate his own donors from among his friends and family. Although both of these theories were supported by plaintiff's experts, the jury rejected them, finding negligence only in the failure to recommend surrogate testing. Accordingly, we do not address any of the facts or claims involving those asserted grounds of negligence.
[3] N.J.A.C. 8:8-5.2, as adopted in 1984, required blood banks to follow both the Code of Federal Regulations and AABB guidelines in taking the medical history of donors and examining them physically. The current version, N.J.A.C. 8:8-6.2, as amended and redesignated effective May 15, 1989, requires consistency with whichever of the two is more stringent. The testimony at trial was that the AABB's standards are the more stringent. This is also so with respect to N.J.A.C. 8:8-7.1, as amended in 1994, which requires the "preparation of all blood and blood components" to be consistent with the more stringent of the CFR or the AABB standards. N.J.A.C. 8:8-9.2, adopted effective August 1, 1994, requires adherence to AABB standards in respect of the detection and evaluation of suspected adverse reactions to transfusion. Note further that N.J.A.C. 8:8-7.9, as adopted in 1984, required observation of AABB standards in intraoperative autologous transfusion procedures. The current version, N.J.A.C. 8:8-8.12, as amended and redesignated effective May 15, 1989, extends that requirement to perioperative autologous transfusion procedures. N.J.A.C. 8:8-9.2, as adopted in 1984, required irradiation of blood to be consistent with AABB guidelines. The current version, N.J.A.C. 8:8-10.2(b)(3), as amended and redesignated effective May 15, 1989, requires consistency with AABB standards or FDA guidelines, whichever is more stringent.
[4] According to its 1992 annual report, admitted into evidence, the AABB insures the representation of "the interests of the blood banking community ... on Capitol Hill and in the state legislatures. Staff also served as an information source, providing advice and expertise on legislative and legal issues affecting blood banking and transfusion medicine." Elaboration of these activities in the annual report describes particular successes of the AABB in communicating the "industry position" to the federal and state legislatures on such issues as government funding for research, "Medicare reimbursement for autologous donations and medical liability reform." It also reports lobbying on behalf of blood shield laws and notes that "[t]he AABB Legislative Bulletin was a key source for information about state government activity affecting blood banking and transfusion medicine. Members were active participants in the program, using their local influence to handle state legislative initiatives."
[5] Despite this concern, defendant's evidence shows that the core test is now routinely used as a surrogate test for non-A, non-B hepatitis. According to the defense figures, some 300,000 persons were infected with hepatitis up to the mid 1980's, of whom 90%, or 270,000, were infected with non-A, non-B hepatitis. Hepatitis B core testing picks up about one-third of donors with non-A, non-B hepatitis. Consequently, use of the core test as a surrogate for AIDS would also have resulted in preventing 90,000 cases of non-A, non-B hepatitis annually.
[6] According to the HIV Report, supra, at 78, as of June 1988, there were 2,399 cases of transfusion-caused AIDS in this country. As of 1992, there were 6,311 cases of transfusion-caused AIDS. Since HIV testing of blood began in March of 1989, however, only 29 such cases have arisen. See Linda M. Dorney, Comment, Culpable Conduct With Impunity: The Blood Industry and the FDA's Responsibility for the Spread of AIDS Through Blood Products, 3 J.Pharm. & Law 129 (1994) (citing Centers for Disease Control, HIV/AIDS Surveillance Report 12 (Oct. 1993)). But see Ross D. Eckert, The AIDS Blood-Transfusion Cases: A Legal and Economic Analysis of Liability, 29 San Diego L.Rev. 203 (1992) (stating that 4,770 patients contracted AIDS through blood transfusion as of February 1992, and citing Centers for Disease Control, HIV/AIDS Surveillance Report 9 (Mar. 1992)).
[7] The transcript of the portion played reads as follows:

JARRIEL: [voice-over]: Dr. Dennis Donohue disagrees. He was head of the FDA's division of blood and blood products from 1980 to 1986. That division regulates the blood industry.
DR. DENNIS DONOHUE, former FDA official: I thought the evidence was good that there was a correlation between anticore positive test results and those people that had been defined as being at risk for transmitting AIDS.
JARRIEL: Why couldn't you insist on that being used?
DR. DONOHUE: Well, we discussed this at an advisory committee meeting. My personal conviction was that it should be done. The committee that addressed it again said no. I thought the committee was heavily weighted, because there was no one on it who wasn't either industry or someone closely allied to industry.
JARRIEL: That sounds almost clubbish.
DR. DONOHUE: I think it is clubbish. I think it, at times is too clubbish.
JARRIEL [voice-over] We asked ... requiring blood collectors to test for AIDS.
DR. DONOHUE: I would point out that, at least to my knowledge, there has never been a regulation published that says that blood has to be tested for the ACLV3 virus by the licensed test.
JARRIEL: The AIDS virus?
DR. DONOHUE: Yes.
JARRIEL: How can that be?
DR. DONOHUE: I don't know who's responsible for it, but somebody ought to put their finger on him and tell him to get at it.
[8] Defendant also argues that the ruling was inconsistent with a prior ruling, made by Judge Van Tassel, who had started the trial but had died during its course. Judge Van Tassel's ruling was in any case in limine. The ruling of Judge Stark, who completed the trial, was in the context of the testimony as it was offered. She clearly had the discretion to rule differently.