700 A.2d 377

JANE DOE, AN INFANT, THROUGH HER GUARDIANS AD LITEM, MR. JOHN DOE AND MRS. SUSAN DOE, PLAINTIFF–APPELLANT, v. THE GREATER NEW YORK BLOOD PROGRAM, A/K/A THE NEW YORK BLOOD CENTER, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 23, 1997—Decided July 28, 1997.

Before Judges LONG, A.A. RODRÍGUEZ [1] and CUFF.

*George T. Baxter* argued the cause for appellant.

*Peter L. Korn* argued the cause for respondent (*McDonough, Korn, Eichhorn & Boyle,* attorneys for respondent; *Mr. Korn* and *Roger K. Solymosy,* of counsel; *Wilfred P. Coronato* on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

Plaintiff, Jane Doe, instituted this action against defendant, the Greater New York Blood Program, after she acquired the human immunodeficiency virus (HIV) through a blood transfusion she received in February, 1982. During the course of the proceedings, plaintiff filed a motion to compel additional discovery and defendant filed a cross-motion for summary judgment. The trial judge granted summary judgment in favor of defendant and denied plaintiff further discovery. Plaintiff appeals.

The case arose when plaintiff was hospitalized at St. Joseph's Hospital and Medical Center shortly after her birth to correct certain congenital conditions. On February 2, 1982, when she was a little over a year old, she was transfused with red blood cells that had been collected, screened and supplied by defendant. The unit of red blood cells, number 1715513, had been collected by

---

[1] Judge Rodríguez reviewed audio tapes of the oral argument on April 23 and participated in a supplemental telephonic argument.

New Jersey Blood Services, a division of defendant, on January 25, 1982. The volunteer donor had donated blood to defendant on one prior occasion (August 12, 1981) and would donate on three subsequent occasions (February 2, 1983; August 10, 1983; and August 14, 1989).

It was not until nearly seven years after plaintiff's transfusion when the blood donor again donated blood that a screening revealed that the donor was HIV-positive. Defendant thereafter performed a "lookback" to notify recipients of this donor's blood, including plaintiff, that they had received blood from a donor who was currently HIV-positive. The 1989 blood donation was not hepatitis B positive.

The following is a précis of the expert evidence which is at the heart of this case. Plaintiff's expert, Dr. Donald Francis, a former Regional AIDS Consultant for the Centers for Disease Control (CDC),[2] wrote in a February 8, 1996, certification that, as early as 1975, defendant's Lindsley Kimball Research Institute performed extensive studies, regarding hepatitis B and patterns of sexual behavior of homosexual men. Francis relied on a 1975 article, entitled *On the Role of Sexual Behavior in the Spread of Hepatitis B Infection*, 83 *Annals of Internal Medicine* 489–95 (1975). Francis related that defendant's scientists had concluded: "Our data would suggest that avoidance of rectal intercourse by homosexuals might substantially reduce the transmission of hepatitis B among them, and, due to the high risk of gonorrhea, syphilis, and hepatitis B in homosexuals, it would seem that they should be advised to refrain from blood donations." Francis opined that this data, reported by defendant's own research facility in 1975, should reasonably have caused defendant's management to advise homosexuals to refrain from blood donation. (Defendant does not concede that the donor in this case was homosexual, but states for

---

[2] Dr. Francis also served in other capacities at the CDC, including Coordinator of AIDS Laboratory activities and CDC AIDS advisor to the Department of Health Services.

the purposes of its brief, "it will be assumed arguendo that the donor was a homosexual.")

Plaintiff's experts also relied on three other medical reports published by the CDC in its *Morbidity and Mortality Weekly Report (MMWR)* which were circulated prior to the January, 1982 donation. The first report, *Pneumocystis Pneumonia—Los Angeles,* 30 *MMWR* 250 (June 5, 1981), had alerted the medical community that there were patients, all of whom were homosexual, with severe immunosuppression that resulted in pneumonia, and that there was an association between the homosexual lifestyle and the disease acquired through sexual contact. Transmission was thought to occur through seminal fluid.

The second report, *Kaposi's Sarcoma and Pneumocystis Pneumonia Among Homosexual Men—New York City and California,* 30 *MMWR* 305 (July 4, 1981), had indicated additional cases of cellular immunodeficiencies among homosexual men, the majority of whom were in New York. Francis emphasized that the article had "alerted the medical community of symptoms to look for in identifying this sexually transmitted disease including [ ] skin lesions, skin lesions plus lymphadenopathy, oral mucosal lesions, inguinal adenopathy plus perirectal abscess, weight loss and fevers." Francis added that this *MMWR* report advised the medical community that "[p]hysicians should be alert for Kaposi's sarcoma, PC pneumonia, and other opportunistic infections associated with immunosuppression in homosexual men." Thus, Francis concluded that this information should have been part of defendant's blood donor screening.

Francis also relied on a third report, *Follow–Up on Kaposi's Sarcoma and Pneumocystis Pneumonia,* 30 *MMWR* 409 (Aug. 28, 1981), where the CDC discussed further cases of Kaposi's sarcoma and pneumocystis pneumonia in New York City and California. The article advised the medical community that forty percent of the cases were fatal, and that it was predominantly a homosexual illness and sexually transmitted. Francis opined that this should have alerted defendant that homosexuals should be advised to

refrain from donating blood and that defendant should have screened for the symptoms associated with the immunosuppression in homosexual men.

Francis stated that it was clear that the immunodeficiency disease was a "gay phenomenon" that was sexually transmitted and forty percent fatal. If it was sexually transmitted, then it was transmitted by blood, and certainly defendant should have known that it could have been transmitted from an infected homosexual to plaintiff. He concluded that defendant failed to act reasonably and appropriately in not advising homosexuals to refrain from donating blood. In addition, he opined that defendant did not act reasonably and prudently because it did not incorporate questions designed to identify the symptoms of an infected homosexual into its donor screening as set forth in the July, 1981 *MMWR* article.

Dr. Theodore A.W. Koerner, Assistant Medical Director at DeGowin Memorial Blood Center, University of Iowa Hospitals and Clinics, and an Associate Professor at the University of Iowa College of Medicine, stated in a February 6, 1996, certification for plaintiff that literature and studies by the time of plaintiff's transfusion "medically established that homosexuals should have been advised to refrain from donating blood because of the extraordinarily high risk of transmitting viral infections." Koerner explained: "These viral infections that were associated with the homosexual lifestyle included syphilis, gonorrhea, hepatitis, and immune deficiency viral infections, [were] originally called GRID, which stood for Gay Related Immune Deficiency Syndrome," which acronym was later changed to AIDS for Acquired Immune Deficiency Syndrome.

Koerner asserted that defendant should have known that its donor policy of including homosexuals exposed the recipients of these blood products to the danger of transmission of viral infections including GRID. Relying on the June 5, 1981, July 4, 1981 and August 28, 1981, reports in *MMWR*, Koerner concluded that homosexuals were shown to have an incidence of an immune deficiency syndrome acquired through sexual contact, and there-

fore also transmitted through blood, so defendant should have excluded homosexuals from its blood donation program or screened them for opportunistic infections. Koerner added that defendant had also been negligent for failing to provide a designated donor program for plaintiff.

Dr. Paul V. Holland, a physician licensed in New York, California, and Maryland, and Medical Director and Chief Executive Officer of the Sacramento Medical Foundation Blood Center, stated in a January 25, 1996, certification for defendant that, as of January and February, 1982, "the disease entity now known as AIDS was little understood and its potential for impact upon the safety of the blood supply was unknown." Holland opined that the standard of care for blood banking at that time could not, and did not, include any precautions addressed to AIDS as a disease or its potential for transmission by blood transfusion. Even as of the middle of 1982, there was still no evidence to establish that AIDS was caused by a transmissible agent and researchers had at least three theories to explain the then-new disease.

Holland stated that it was not until December 10, 1982, that the CDC published information in *MMWR* about the first case of possible transfusion-associated AIDS. *Possible Transfusion—Associated Acquired Immune–Deficiency Syndrome (AIDS),* 31 *MMWR* 652–54 (1982). According to Holland, on March 4, 1983, recommendations were issued by the Public Health Service in an Interagency Recommendation of the Food and Drug Administration (F.D.A.), the CDC, and the National Institutes of Health. The first F.D.A. recommendations regarding AIDS and blood banking were issued on March 24, 1983. Holland concluded: "In my opinion, within a reasonable degree of medical and blood banking certainty, there could not have been any departures from accepted standards of care or from the exercise of reasonable care which in any way contributed to plaintiff contracting HIV or eventually developing AIDS."

In a second certification dated March 26, 1996, Holland stated that, although Francis and Koerner maintained that defendant

failed to act reasonably and appropriately by not advising homosexuals to refrain from donating blood and by not incorporating questions into their donor screening procedures designed to identify signs and symptoms of infection in homosexual men, as of January, 1982, "no blood bank in the world was advising homosexual men to refrain from donating blood." Holland opined that Francis' and Koerner's recommended procedures were not required by reasonable care or any standard of care at that time. Holland added that no blood center in the world interpreted [the July 4, 1981, *MMWR* article] as a warning to incorporate donor screening for symptoms of skin lesions plus lymphadenopathy, oral mucosal lesions, inguinal adenopathy plus perirectal abscess, weight loss, and fevers. At that time, the "CDC did not indicate that this yet unnamed agent of AIDS was blood-borne (or even that a virus was the cause of AIDS)."

Attached to Holland's second certification was an example of the donor registration form generally used by defendant in January 1982 and a somewhat unclear copy of the actual donor registration form completed when unit 1715513 was donated. These forms show that the donor answered he was in good health; that he did not have lymph gland disease or cancer, respiratory infection, cold, flu, chest pain and shortness of breath, weight loss, or fever. The donor registration form indicated that he weighed 185 pounds, which was the same as he had weighed five months earlier when he had donated blood. His temperature was normal. Holland explained that the donor's being asked about lymph gland disease or cancer covered symptoms such as lymphadenopathy and inguinal adenopathy, and being asked about respiratory infection, cold, flu, chest pain, and shortness of breath covered any known history of pneumonia.

Holland emphasized that a sample of the donor's blood was tested for syphilis and hepatitis B surface antigen and found suitable for release into the transfusable blood supply. All blood released for transfusion was tested in 1982 for hepatitis B and syphilis. The donor was questioned and answered that he did not

have yellow jaundice or hepatitis and had not been exposed to either within the last six months. An arm inspection was performed to determine if there were any signs of intravenous drug abuse; none were found.

Holland addressed Koerner's opinion that defendant was negligent for failing to provide a "designated donor program" for plaintiff by stating that this alternative was not in existence in January and February 1982. Holland wrote that there is evidence that directed donor blood is less safe than volunteer donor blood. Even when directed donor transfusion is available, it is usually offered by hospitals, not by blood banks.

On these certifications, plaintiff moved for production of documents and to compel answers to interrogatories. Plaintiff's motion for discovery sought, among other things, the following: documents regarding donor testing; educational materials or brochures provided to the donor; and the donor history form and records of follow-up consultations. Interrogatories propounded by plaintiff, sought, among other things, the name of defendant's employee who took the donor history; the actual donor history card for each of the donor's donations; all lab tests performed on the donor's blood; and information about the donor, including his name and address; sexual preference; and his actual HIV lab test. Defendant opposed plaintiff's discovery motion and filed a cross-motion for summary judgment, essentially contending that it acted in full conformity with the state of scientific knowledge in the handling of plaintiff's blood transfusion.

The judge addressed the summary judgment motion first, framing the issue as follows: "whether a reasonable jury could find that defendant breached a standard of care owed to plaintiff by not implementing surrogate testing and high risk screening procedures in light of the state of medical information available about HIV/AIDS in February, 1982." She explained that "[s]urrogate testing involves one of three different tests to detect whether a donor's blood is contaminated with Hepatitis." She also indicated

that, for purposes of her opinion, the term "high risk donor" primarily referred to young male homosexuals.

The judge reviewed the experts' certifications and medical studies. She also reviewed federal and state court decisions which addressed the issue of whether blood banks had a duty to screen and test for HIV at various dates between 1982 and 1985. She emphasized that, in the June 5, 1981 *MMWR,* the CDC reported that transmission was thought to occur through seminal fluid, not blood products. The judge noted that at the time of the second *MMWR* report in July 4, 1981, pneumocystis carinii and Kaposi's Sarcoma were not medically associated with blood-borne transmission. Addressing the August 28, 1981 *MMWR,* the judge wrote: "Importantly, the blood bank industry was not specifically mentioned by the study and screening precautions were not recommended. No further medical information was issued by the CDC prior to the February 1982 donation." The judge observed that "not one [federal or state level] decision found a duty for a blood bank to high risk screen or surrogate test prior to March of 1983." She wrote:

In the instant case, the key date of concern is the date of plaintiff's transfusion on February 2, 1982. Judge Pressler's opinion in *Snyder I [Snyder v. Mekhjian,* 244 *N.J.Super.* 281, 582 *A.*2d 307 (App.Div.1990), *aff'd o.b.,* 125 *N.J.* 328, 593 *A.*2d 318 (1991) ] & *Snyder II [Snyder v. American Ass'n of Blood Banks,* 282 *N.J.Super.* 23, 659 *A.*2d 482 (App.Div.1995), *aff'd,* 144 *N.J.* 269, 676 *A.*2d 1036 (1996) ] found a question of fact existed as to the blood bank's duty to screen and test in August of 1984. In the instant case, the blood donation and transfusion in question occurred a full eighteen months earlier than the one in *Snyder.* Based upon the medical evidence presented by the parties, Judge Pressler's opinion and findings in *Snyder I & II,* and the heightened summary judgment standard recently established by our Supreme Court in *[Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 666 *A.*2d 146 (1995) ], I hold that no reasonable jury could conclude that the blood bank industry had a duty to high risk screen and/or surrogate test in February of 1982. Rational minds simply could not differ on this point.

The judge next addressed an additional negligence claim against defendant for its failure to advise plaintiff of a theoretical option to receive a transfusion with blood from a designated donor pro-

gram.[3] The judge granted summary judgment on this claim, holding: (1) in February, 1982, such a program was not a widely recognized alternative to the anonymous donation system then used by defendant; (2) blood supplied from designated donors would not theoretically be any safer since both anonymous and designated blood supplies would not have been high risk screened and/or surrogate tested by blood banks; and (3) plaintiff did not demonstrate that defendant had a duty to inform blood recipients of the designated donor alternative.

Finally, the judge addressed plaintiff's motion for additional discovery, including release of the identities of both the donor and blood bank screening registrar who conducted the donor's interview in January 1982, and production of all educational and training materials from that time. Recognizing that plaintiff had already been afforded limited discovery, the judge concluded that additional discovery was unnecessary because: (1) defendant did not dispute the fact that its blood product was the sole cause of plaintiff's infection; (2) defendant conceded that it did not high risk screen any prospective donors or conduct any surrogate testing in February, 1982; (3) defendant admitted it did not hand out any educational materials and that employee training materials were nonexistent; and (4) the dates of donation, transmission, and discovery of infection had all been supplied and were undisputed.

The judge ruled that, in light of defendant's admissions, the additional information plaintiff sought was irrelevant; that plaintiff had failed to meet the burden of showing that there were additional critical facts within defendant's knowledge essential to plaintiff's cause of action; and that permitting further discovery would be fruitless and potentially devastating to the privacy interests of the anonymous donor.

---

[3] A designated donor program is one which permits a blood recipient to receive blood from a pre-determined party, such as a family member or friend.

Plaintiff moved for reconsideration on both the grant of summary judgment and the denial of discovery. Among the arguments she advanced was that the trial judge viewed her complaint too narrowly. According to plaintiff, even if defendant did not have any duty in 1982 vis á vis AIDS, if it failed in its duty to screen donors under the then existing standards for other blood transfusible diseases and that failure led to plaintiff's transfusion, the fact that the ultimate harm suffered was the as-yet unknown AIDS virus would not insulate it from liability. She contended that the question was whether a duty to prevent transmission of infectious blood-borne diseases existed in 1982, not whether a specific duty to prevent transfusion-associated HIV was sufficiently established at the time. Accordingly, she argued that, even if the risk of transfusion-associated HIV was not sufficiently established in February, 1982, if defendant breached a duty to her in connection with its screening for known diseases and, as a result, failed to exclude her donor, her specific injury need only be within the range of risks associated with unsuitable blood donors from which defendant had a duty to protect its recipients in order to be actionable. She claimed entitlement to further discovery to pursue this theory.

In response, defendant argued as follows:

Plaintiff, however, now claims that this is not her primary allegation. Instead, she argues that her primary allegation is that New York Blood Center otherwise failed to properly screen this donor pursuant to the then existing standards and that "but for" its failure to properly screen the donor and reject his donation, plaintiff would not have contracted HIV. Plaintiff's argument, however, is a naked allegation without one iota of evidence to support it. Indeed, the discovery clearly establishes that New York Blood Center complied with all then existing regulations in the collection of the unit of blood in question.

The court will recall the second certification of Paul V. Holland, M.D. dated March 23, 1996 submitted on behalf of New York Blood Center in support of the motion for summary judgment. In his certification, Dr. Holland sets forth that "the collection of unit 1715513 complied with all applicable professional standards of care, including federal and state regulations in existence in January 1982." That is, all requirements for screening the donor and testing a sample of the unit of blood he donated were met. From a review of the data for the unit of blood associated with unit 1715513, it is clear that the unit of blood met the then existing standards

and regulations for release of this unit into the transfusible blood supply. Plaintiff completely lacks a good faith basis to allege otherwise.

The trial judge rejected plaintiff's argument and denied the motion for reconsideration without addressing specifically the alternate theory of liability referred to in plaintiff's motion.

On appeal, plaintiff argues that the trial judge erred (1) in granting summary judgment in favor of defendant and opining that reasonable minds could not differ on the issue of whether transfusion-associated HIV was sufficiently established in February 1982 so as to create a duty in defendant; (2) in failing to recognize defendant's duty to protect plaintiff from the risks of infectious diseases, including those which may not have been precisely quantified but which fell within the orbit or range of risks of an unsuitable blood donor; and (3) in denying plaintiff further discovery.

■ We have carefully reviewed this record in light of these contentions and have concluded that, as to the grant of summary judgment based on the determination that defendant had no duty to implement surrogate testing or high risk screening procedures in light of the state of scientific information on HIV/AIDS, there is no warrant for our intervention. We affirm substantially for the reasons expressed by the trial judge in her thorough letter opinion of June 7, 1996.

■ We part company from her on the next two issues which we view as intertwined. We agree with plaintiff that the trial judge viewed her complaint too narrowly and that it encompassed more than a challenge based on a breach of duty in connection with specific testing for AIDS. We also agree with plaintiff that a tortfeasor does not necessarily have to foresee the precise hazard or exact consequences of its misdeeds, but need only anticipate that some harm might transpire. *Ginnelly v. Continental Paper Co.*, 57 *N.J.Super.* 480, 493–94, 155 *A.*2d 154 (App.Div.1959) (quoting 2 *Fowler V. Harper & Fleming James, Jr., The Law of Torts* § 20.5 at 1147 (1956)), *certif. denied*, 31 *N.J.* 293, 157 *A.*2d 363 (1960). *See Black v. Public Serv. Elec. & Gas Co.*, 98 *N.J.Super.*

366, 377, 237 A.2d 495 (App.Div.1968). In other words, if defendant failed to abide by screening standards existing in 1982, including screening for communicable diseases other than AIDS, as a result of which donation #1715513 was not excluded, it breached a duty to plaintiff. The fact that the ultimate harm which came to plaintiff was AIDS and not the exact disease for which the screening should have been done is of no consequence. The question then is whether, in fact, defendant's procedures accorded with applicable blood banking standards in 1982. The answer to that question is unclear to us from this record, which is what brings us to plaintiff's discovery request.

We think plaintiff was entitled to explore in detail every aspect of her transfusion with this particular donor's blood to ascertain whether existing screening standards in 1982 were fully adhered to by defendant. We recognize the "significant public and private considerations" which undergird the confidentiality of blood bank AIDS records. *Snyder v. Mekhjian,* 244 *N.J.Super.* 281, 296, 582 *A.*2d 307 (App.Div.1990), *aff'd o.b.,* 125 *N.J.* 328, 593 *A.*2d 318 (1991). Like the panel in *Snyder,* however, we are satisfied that plaintiff's discovery needs here can be met consonant with that confidentiality under court supervision. For example, the use of a deposition of the donor (if he is still alive) on written questions or a veiled oral deposition may be ordered. No such confidentiality considerations apply to the blood bank worker whose evidence may be elicited without limit except for revealing the donor's name. Discovery includes, but is not limited to, actual lab tests performed on the donor's sample and such other information as is relevant to the issue remaining. Again, this discovery is solely for the purpose of determining whether defendant lived up to each and every aspect of relevant screening standards in January, 1982 when the tainted donation was collected and whether, if defendant had adhered to those standards, plaintiff's donor would have been excluded from participation in its blood donation program. When discovery is complete, the defendant may again move for summary judgment on this remaining aspect of the

complaint. We reverse the order of summary judgment on the claim to which we have adverted and remand the case for discovery subject to supervision by the court.

Affirmed in part; reversed and remanded in part.