776 A.2d 244 (2001)
342 N.J. Super. 219
ESTATE OF Ernestine ELKERSON, Gwendolyn Elkerson, individually and as Administratrix Ad Prosequendum, Charles Elkerson, Erica Elkerson, Sherique Elkerson, Jerome Houser, and Chenille Elkerson, Plaintiffs-Appellants,
v.
NORTH JERSEY BLOOD CENTER, an Organization doing business in the State of New Jersey, Defendant-Respondent, and
University of Medicine and Dentistry of New Jersey, a state entity, and American Association of Blood Banks, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued telephonically March 29, 2001.
Decided July 2, 2001.
*246 Gregg F. Paster, Hackensack, argued the cause for appellants (Ortiz & Paster, attorneys; Mr. Paster, on the brief).
Roger G. Ellis, Clark, argued the cause for respondent (Bumgardner & Ellis, attorneys; Mr. Ellis and Alyson C. Douma, on the brief).
No other parties participated in this appeal.
Before Judges KEEFE, EICHEN and STEINBERG.
*245 The opinion of the court was delivered by EICHEN, J.A.D.
Plaintiffs' decedent died of cirrhosis of the liver on October 1, 1993. Plaintiffs contend that decedent acquired the condition as the result of receiving a blood transfusion tainted with the hepatitis B virus in 1983. Defendant North Jersey Blood Center (NJBC) denies that the decedent received tainted blood, and argues that even if it was tainted, the blood center employed the testing procedures utilized by most blood centers at the time the blood was donated and, therefore, it is not liable to plaintiffs.
Plaintiffs premised their wrongful death action against the blood bank on the theory that the blood bank was negligent in failing to employ the hepatitis core antibody test in 1983. Plaintiffs maintain that test was available and would have reduced the risk of failing to detect latent hepatitis B, as compared with the surface antigen test used by NJBC, which plaintiffs allege failed to detect the virus.[1] Accordingly, it was plaintiffs' burden to prove that NJBC was negligent in failing to use the core antibody test; that its negligence enhanced the risk that decedent would contract hepatitis B; and that the enhanced risk was a substantial factor in causing her injury. Snyder v. Mekhjian, 244 N.J.Super. 281, 293, 582 A.2d 307 (App.Div.1990) (Snyder I), aff'd o.b., 125 N.J. 328, 593 A.2d 318 (1991).
This appeal basically addresses two issues: The first issue requires us to decide whether the court erred in denying plaintiffs' motion for further discovery of the blood donors, specifically, discovery of their identities for the purpose of retesting them for the presence of the virus. The second issue requires us to determine whether the judge erred in instructing the jury on the applicable standard of care with respect to NJBC's conduct in testing the blood used in decedent's transfusion for the hepatitis B surface antigen: a modified professional negligence (medical malpractice) standard or an ordinary due care negligence standard.
Prior to trial, a Law Division judge denied plaintiffs' discovery request. At the conclusion of the trial, a different Law Division judge rejected plaintiffs' request for an ordinary, "reasonable persons" negligence jury instruction and gave a modified medical malpractice charge on the standard of care applicable to the blood *247 center. A jury found no negligence against NJBC and returned a verdict in its favor. This appeal then ensued.
On appeal, plaintiffs contend that the trial court erred (1) in denying plaintiffs' motion seeking discovery of the donors' identities; (2) in giving a professional negligence charge rather than a standard negligence charge to the jury; and (3) in the wording of the verdict sheet with respect to the issue of proximate cause.
We summarize briefly the background evidence adduced at trial. In May 1983, following a diagnosis of cervical cancer, plaintiffs' decedent Ernestine Elkerson underwent a hysterectomy at the University of Medicine and Dentistry of New Jersey (UMDNJ). Several months later, in October 1983, UMDNJ diagnosed Ms. Elkerson as positive for infection with the hepatitis B virus. The decedent received treatment at UMDNJ for the condition for several years following her diagnosis. In 1990, the plaintiffs' decedent tested positive for the hepatitis B delta virus. On October 1, 1993, she died of cirrhosis of the liver.
Plaintiffs filed their complaint on September 18, 1995. Named as defendants in the action were New Jersey Blood Center (NJBC), UMDNJ, and the American Association of Blood Banks AABB).[2] The amended complaint alleges that the decedent contracted hepatitis B with delta virus (hepatitis D) as a result of a blood transfusion administered to her during her admission to UMDNJ in 1983. During that admission, Ms. Elkerson received four units of packed red blood cells and frozen plasma, three of which UMDNJ obtained from NJBC.[3] Prior to distributing these units, NJBC tested the blood for hepatitis B with the surface antigen test and none of the blood tested positive for the virus.
We address first the discovery issue. During pre-trial discovery, plaintiffs received redacted donor cards, completed questionnaires and a checklist and physical examination notes from medical personnel at the blood center with respect to the blood donors. Based on that, plaintiff moved to compel defendant to disclose their identities and addresses.
On the motion to compel, plaintiffs argued that they wanted the discovery so that the court could contact the donors to determine if they would be willing to answer some additional questions and submit an additional blood sample.[4] This request was based on the theory that if these donors tested negative for the hepatitis virus now, they would have tested negative in 1983, thereby obviating the need for continuing the lawsuit.
Defendant NJBC countered that the plaintiffs had not established a sufficient need for the information in order to overcome the donors' privacy interests. NJBC also argued that the type of hepatitis that plaintiffs' decedent was diagnosed with, hepatitis B with a delta virus, would have been detected by the surface antigen test performed by the blood bank had it *248 been present and, therefore, core antibody testing was unnecessary.[5]
The trial court denied plaintiffs' motion, in part, because plaintiffs were not challenging the blood center's screening method as in Snyder I; plaintiffs failed to demonstrate a "particularized need"; and on balance, plaintiffs' right to obtain the identities of the donors did not justify such intrusion into the privacy of the donors.
Our courts have weighed the potential adverse effects to the blood collection system and the donors' privacy interests against a plaintiff's need for discovery so that victims of contaminated blood have an opportunity to recover in this type suit. See Snyder I, supra, 244 N.J.Super. 281, 582 A.2d 307; see also Snyder v. American Ass'n of Blood Banks, 282 N.J.Super. 23, 659 A.2d 482 (App.Div.1995) (Snyder II), aff'd 144 N.J. 269, 676 A.2d 1036 (1996); Doe v. Greater New York Blood Program, 304 N.J.Super. 287, 700 A.2d 377 (App.Div.1997).
In balancing those interests in this case, we conclude that identifying the donors now for the purpose of re-testing them with the core antibody test does not justify overcoming the privacy interests of the donors or the blood bank industry's interest in protecting a continuing source of blood product. That is because testing for the virus now would not provide sufficient evidence to prove that tainted blood furnished by NJBC caused decedent's hepatitis, even giving plaintiffs the benefit of all favorable inferences.[6]
We recognize that proving a causal relationship between the blood received by plaintiffs' decedent and her acquisition of hepatitis is an important element of plaintiffs' cause of action, an element on which plaintiffs have the burden of proof. However, eighteen years have passed since the decedent received the allegedly tainted transfusion. Given the time lapse, even if re-testing of the three NJBC blood donors produced positive reactions for the hepatitis B delta virus, there still is no way for any reasonable fact-finder to conclude that the donors were carriers of the virus back in 1983.[7]
Dealing as we are then with less than a "possibility" that the donors were reactive for the virus in 1983, we must weigh the conflicting interests in favor of protecting the blood bank's need for a continuing source of blood supply and the donors' privacy interests against plaintiffs' need to know the donors' identities. As we said in Snyder I, the "confidentiality of blood bank ... records rests upon significant public and private considerations and is ordinarily essential to assure the continued effectiveness of the screening process, the willingness of donors to continue to *249 participate in blood collection efforts, and the general integrity of the nation's blood programs." Snyder I, supra, 244 N.J.Super. at 296, 582 A.2d 307. Accordingly, we affirm the order denying discovery of the donors' identities.
We turn next to the jury charge on negligence and conclude that the trial judge erred in instructing the jury on the standard of conduct applicable to blood centers. Therefore, we reverse the judgment. Plaintiffs submitted an enhanced risk charge requesting the court to explain negligence to the jury by using an ordinary negligence standard. That standard would have permitted the jury to determine how a reasonably prudent blood bank should have performed under the circumstances and would have allowed the jury to analyze NJBC's testing procedure under that standard. Specifically, plaintiffs requested the court to tell the jury that "[b]lood banks in New Jersey are required to take all measures and precautions which a reasonable and prudent blood banker would have taken at the time period referred to in this case, specifically, Spring of 1983."
The court rejected the proposed charge because it viewed the collecting and processing of blood as a skilled medical service, determining, therefore, that NJBC should be treated as a medical professional. Consequently, the court gave a modified medical malpractice charge to the jury essentially instructing it that if NJBC conformed to the generally recognized and accepted practices in the blood bank industry, it could not find NJBC negligent. The court told the jury that NJBC was a health care provider and, therefore, represents that it "possess[es] that degree of knowledge, skill and care which is possessed and used by the average Blood Bank." It then told the jury that "[t]he required knowledge, skill, and care must be judged by the standard practice of blood banking in April of 1983." (Emphasis added.)
The court iterated this custom-based standard of care several times throughout the charge. Specifically, the court told the jury that
[t]he law does not require that a Blood Bank guarantees a favorable result. The law recognizes that the practice of Blood Bank medicine, according to standard medical practice, will not necessarily prevent the poor result. If the Blood Bank has brought and applied the required knowledge, skill, and care to the patient, it is not liable or responsible simply because a bad result has occurred.
Now the obligation or duty of care in which the law imposes upon a Blood Bank is to bring to its patient that knowledge, skill, and care which are ordinarily possessed and exercised in similar situations by the average member of the profession in its field. The Blood Bank is obliged to use its knowledge and skill in an effort to care for its patient according to standard medical practice.
If you find that the defendant Blood Bank has complied with this standard, it is not negligent and, therefore, not liable to the plaintiff estate regardless of the result.
On the other hand, if you find that the Blood Bank has departed from the standard of care resulting in the occurrence complained of, then you should find the defendant negligent or responsible to the estate to respond in damages.
On appeal, plaintiffs make the following arguments concerning the jury charge with which we concur. They argue that the charge virtually guaranteed a finding of no negligence on the part of the blood center because the evidence disclosed that *250 NJBC, like virtually all blood banks, used the surface antigen test and not the core antibody test in 1983, thus establishing the standard of conduct or practice in the blood bank industry as the surface antigen test, even though the Center for Disease Control (CDC) recommended core antibody testing as early as January 1983. See Snyder I, supra, 244 N.J.Super. at 288, 582 A.2d 307. Plaintiffs assert that such a custom-based standard cannot be correct because satisfaction of that standard alone in this case could be seen as unreasonable and, therefore, negligent. Thus, under a custom-based system, NJBC could insulate itself from liability by simply conforming its practices to what was uniformly done by most blood banks, even though more reliable testing methods were available at the relevant time. Plaintiffs insist that such a result is contrary to the principles established in Snyder I and Snyder II. We agree.
Evidence of the custom or practice of a particular industry does not conclusively dispose of the issue of the proper standard of conduct, see Wellenheider v. Rader, 49 N.J. 1, 7, 227 A.2d 329 (1967), even though a blood bank must exercise special knowledge and skill. "The standard of conduct is reasonable care, that care which a prudent [person] would take in the circumstances." Ibid. Quoting Dean Prosser, the Court explained:
Even an entire industry, by adopting such careless methods to save time, effort or money, cannot be permitted to set its own uncontrolled standard.... And if the only test is to be what has been done before, no industry or group will ever have any great incentive to make progress in the direction of safety.... Much the better view, therefore, is that of the great majority of the cases, that every custom is not conclusive merely because it is a custom, and that it must meet the challenge of "learned reason," and be given only the evidentiary weight which the situation deserves. It follows that where common knowledge and ordinary judgment will recognize unreasonable danger, what everyone does may be found to be negligent; and that there will be extreme cases where it is so clearly negligent in itself that it may even be excluded from evidence.
[Wellenheider, supra, 49 N.J. at 7-8, 227 A.2d 329 (quoting Prosser, Torts § 33, 170 (3d ed.1964)).]
Even if its services are integral to those of health care providers such as hospitals and doctors, to allow the blood bank industry to set its own standard of conduct is tantamount to allowing it to set the limits of its own legal liability, even though those limits are below a level of care readily attainable. See United Blood Servs. v. Quintana, 827 P.2d 509, 520 (Colo.1992). Hence, if the blood bank industry is allowed to establish its own custom or practice of testing for the presence of an infectious disease, then no matter how unreasonable such standard might be by ordinary judgment, all members of the blood bank industry would be insulated from liability as long as they conformed their practice to the industry's self-established norm. This result is not tolerable in our system of justice. The standard is not what test the average member of the blood bank industry used to screen for the hepatitis B virus in 1983, but what test a reasonable blood bank should have used given reasonably available testing alternatives at the relevant time.
Hence, "when a risk is obvious and a precautionary measure available, an industry or professional standard or custom that does not call for such precaution is not conclusive, if, regardless of the standard or custom, the exercise of reasonable care *251 would call for a higher standard." Klimko v. Rose, 84 N.J. 496, 506 n. 4, 422 A.2d 418 (1980).
The trilogy of blood bank cases decided by this court support this conclusion. Snyder I, supra, 244 N.J.Super. 281, 582 A.2d 307; Snyder II, supra, 282 N.J.Super. 23, 659 A.2d 482; Doe, supra, 304 N.J.Super. 287, 700 A.2d 377. In Snyder I, the plaintiff contracted HIV following an infusion of blood during surgery to repair a bleeding artery. Plaintiff filed suit against the doctors and the blood bank based on theories of both strict liability and negligence. The claim against the blood bank alleged that it "greatly enhanced [plaintiff's] risk of receiving contaminated blood by failing to prescribe and implement available risk-reducing procedures in the blood-collection process" and that the bank "negligently failed to follow such screening procedures as it did then have in place." Snyder I, supra, 244 N.J.Super. at 286, 582 A.2d 307. The blood transfusion in that case occurred in August 1984; HIV was identified as the cause of AIDS in April 1984; and, by March 1985, tests were available to screen blood for the presence of HIV.
The plaintiff's expert alleged that the performance of core antibody testing probably would have led to the rejection of the donor's blood. The trial court denied the plaintiff's request for further information concerning the donor.[8] We reversed the trial court's denial of plaintiff's discovery request. Id. at 297, 582 A.2d 307. In the course of our decision, we noted that there was a factual question as to the appropriateness of the blood bank's conduct, irrespective of its compliance with the guidelines of the AABB respecting screening procedures in effect at the time. Id. at 293, 582 A.2d 307. In so noting, we acknowledged our willingness to evaluate the reasonableness of a blood bank's conduct, notwithstanding what other blood banks might be doing to safeguard their blood supply. We reached the same conclusion in Snyder II where we applied the reasonableness and ordinary prudence standard in analyzing the duty of the AABB in establishing appropriate guidelines for screening and testing for HIV-positive donors. Snyder II, supra, 282 N.J.Super. at 43-44, 659 A.2d 482.
In Doe, supra, 304 N.J.Super. 287, 700 A.2d 377, plaintiff tested HIV-positive after receiving a blood transfusion from the Greater New York Blood Program in February 1982. It was not until seven years after plaintiff's transfusion that a screening revealed that the donor was HIV-positive. Defendant then performed a "look-back" and notified plaintiff of the problem.
Defendant moved for summary judgment. The judge reviewed the experts' certifications and medical studies as well as various federal and state decisions addressing the question of whether blood banks had a duty to screen for HIV between 1982 and 1985. Id. at 296, 700 A.2d 377. The trial judge emphasized that as of August 1981 the CDC reported that transmission of the HIV virus was thought to occur through seminal fluid, not through blood products. Ibid. The judge also observed that "not one decision found a duty for a blood bank to high risk screen or surrogate test prior to March of 1983." Ibid. Noting that plaintiff received the blood transfusion thirteen months before any blood testing for HIV was being recommended, and eighteen months before *252 the transfusion in Snyder I, the judge granted summary judgment, concluding that "rational minds simply could not differ" on the issue of whether "the blood bank industry had a duty to high risk screen and/or surrogate test in February of 1982." Ibid.
We agreed and affirmed the summary judgment on that point. However, we "part[ed] company from" the judge with respect to whether the blood bank could be viewed as acting unreasonably when it failed to screen for other infectious diseases that might have resulted in rejection of the donor's blood, despite the fact that it may have "complied with all applicable professional standards of care, including [existing] federal and state regulations in January 1982." Id. at 298, 582 A.2d 307 (emphasis added). As is evident from our decision in Doe, we considered the blood bank's duty of care not in terms of the national standards actually being utilized by blood banks across the country, but by analyzing the reasonableness of the blood bank's conduct given the available testing measures that could have rejected this donor's blood for other reasons. Even as early as Brody v. Overlook Hospital, 66 N.J. 448, 450, 332 A.2d 596 (1975), the Supreme Court remarked outright that a blood bank was under an "obligation to use due care."
[7] In sum, these blood bank cases clearly indicate that the standard of care for judging the conduct of blood centers and related groups is the ordinary, reasonable care standard, not the custom-based standard of conduct the trial court used in this case. This custom-based charge had the clear capacity to affect the result of the trial, especially when viewed in light of plaintiffs' expert's testimony.
Plaintiffs provided expert testimony from Dr. Donald P. Francis, M.D., an expert in the fields of epidemiology and virology, specifically with regard to hepatitis, blood transmission disease and the screening of high risk donors in a blood bank setting. Dr. Francis opined that by not performing core testing in April 1983, NJBC's conduct was not "reasonable and prudent." He determined that had core testing been used, a low level carrier donor would have been screened out. Dr. Francis also opined that all blood banks should have been using core testing in 1983, noting that "[t]he fact that one is acting poorly or the whole group is acting poorly doesn't excuse any of them."
Dr. Francis's qualifications were extensive. He received his medical degree from Northwestern Medical School in Chicago and a doctorate in virology from the Harvard School of Public Health. Dr. Francis was employed by the CDC from 1971 to 1992 where he worked on hepatitis and AIDS, among other infectious diseases. Dr. Francis supervised the first AIDS laboratory at the CDC from 1981, the beginning of the AIDS epidemic, until 1992. In addition, he served as the AIDS advisor to the State of California and chaired the San Francisco Mayor's HIV Task Force. Since 1992, he has been working on an AIDS vaccine in private industry. Dr. Francis also published numerous medical articles, half of which concern hepatitis.
Dr. Francis testified that hepatitis B is a viral infection causing inflammation of the liver. Ten percent of individuals who develop hepatitis become chronic carriers of the virus. This 10% includes "low level" carriers of the virus, those who test negative but are still infectious.
Dr. Francis also testified that plaintiffs' decedent manifested hepatitis symptoms about four months after her blood transfusions, which he opined was a normal incubation period. He further asserted that the test used by NJBC, the hepatitis *253 B surface antigen test, is a "good test but not perfect" because there are a small group of carriers who will test negative with the surface antigen test. In contrast, Dr. Francis opined, the core antibody test "will cover all of these individuals who are infected with hepatitis B."
Dr. Francis described how, in January 1983, he personally tried to get the blood bank industry to use the core antibody test. At that time, he was the assistant director for the hepatitis division of the CDC. Dr. Francis explained that 1983 "was a time when AIDS was emerging and that the hepatitis B core test was also recommended as a useful test to screen out individuals at risk of AIDS." According to Dr. Francis, "the major group who w[as] transmitting AIDS by blood transfusions were homosexual men, and they ha[d] a very high rate of the hepatitis B infection."
Dr. Francis stated that on January 4, 1983, he addressed an emergency meeting at the CDC attended by "a large representation of the blood banking and plasma collection industries," including the AABB, the Red Cross, and other blood banking organizations, to discuss transfusions and the AIDS problem. Dr. Francis testified that at the meeting, "as an officer of the Public Health Services and Center for Disease Control," he recommended "that blood banks screen out all donors who were infected with hepatitis B, using the core antibody test to exclude all individuals who were infected with hepatitis B." Dr. Francis further stated, however, that "[t]here was a reluctance of the blood banking industry to accept the reality [that] there was such a thing as transfusion-associated AIDS, and as a result, [a] reluctance to take aggressive action to prevent it."[9]
The report that evolved from that January 1983 CDC emergency meeting recommended that blood banks begin evaluating core antibody testing. However, NJBC did not begin using core testing until December 1986, while the AABB did not begin recommending its use until 1987.
Aided by the foregoing expert evidence to guide its determination concerning the reasonableness of NJBC's conduct in failing to use the core antibody test in plaintiffs' decedent's case, we believe that a properly instructed jury reasonably could conclude that, irrespective of the custom in the blood bank industry in 1983, exercise of reasonable care required NJBC to use the core antibody test at that time. However, instead of applying this reasonable care standard, the court directed the jury to accept the experts' opinions as to what was the ordinary custom in the industry in 1983 and to use that as its standard to determine whether the blood center was negligent. Nowhere in the charge is there any direction that allowed the jury to question the reasonableness of the custom or practice employed by the industry. Where, as here, the industry standard could be viewed as falling below ordinary care, the jury should have been instructed it could reject that custom as the standard, in light of Dr. Francis' testimony, and reach its own conclusion based on what is reasonable under all the circumstances.
In sum, the trial court's negligence charge constitutes reversible error because it did not allow the jury to reject the industry standard applied uniformly by blood banks in 1983 in favor of its own expert-informed judgment in determining *254 whether that custom was or was not reasonable. In light of the expert evidence that a more effective test was available to screen out blood tainted by the hepatitis B virus in April 1983, we are convinced that the erroneous charge was capable of producing an unjust result.
In the interest of completion, we address briefly plaintiffs' claim of error directed to the verdict sheet.
The first three interrogatories on the verdict sheet read as follows:
1. Was defendant North Jersey Blood Center negligent?
____YES ____NO
If NO return your Verdict
If YES go to # 2
2. Did defendant North Jersey Blood Center's negligence unreasonably create an enhancement of Ernestine Elkerson's risk of contracting hepatitis?
____YES ____NO
If NO return your Verdict.
If YES go to # 3
3. Was the enhanced risk a substantial factor in producing Ernestine Elkerson's contracting Hepatitis?
____YES ____NO
If NO return your Verdict.
If YES go to # 4.
(Emphasis added).
During the charge conference, plaintiff objected to the use of the term "unreasonably" in the second interrogatory concerning proximate cause as redundant. Plaintiffs argued that the use of the term was redundant because the interrogatory required the jury to find negligence twice. Defendant argued that the language mirrored the language in Snyder I, and, therefore, should be included. Agreeing with defendant, the trial court ruled that the verdict sheet should read the way it was presented.
We agree that the verdict sheet was improper in using the word "unreasonably" in the second interrogatory. The use of the word imposed a double burden on plaintiffs to prove that NJBC's conduct was negligent, i.e., unreasonable, because an affirmative response to the first interrogatory already required the jury to consider whether NJBC acted unreasonably. Hence, the word "unreasonably" should have been deleted from the interrogatory.
Affirmed, in part; reversed, in part; and remanded for further proceedings not inconsistent with this decision.
NOTES
[1] Although plaintiffs also alleged in their amended complaint that NJBC "negligently failed to adequately screen the blood supply for hepatitis B," their expert's opinion did not provide a factual basis to support that claim, the expert's primary focus being on the inadequacy of the testing methods used by the blood bank in April 1983.
[2] Prior to trial, the court granted summary judgment to UMDNJ. The record is unclear as to the status of AABB as a party to the suit but we assume it was dismissed because the case was submitted to the jury with NJBC as the sole defendant.
[3] The fourth unit was collected by the Blood Bank of the Alameda Contra Costa Medical Association in Oakland, California. Plaintiffs did not name this entity as a defendant in this action.
[4] Plaintiffs were willing to have the court act as a conduit for the information in order to protect the donors' confidentiality.
[5] Notably, both plaintiffs' and defendant's experts agreed that hepatitis D increases the level of hepatitis B surface antigen in the blood. Defendant's expert contended that, as a result of this phenomenon, the surface antigen test would have detected the hepatitis B surface antigen in the donors' blood had it been present. Plaintiffs' expert agreed that the hepatitis B and D viruses are "piggyback" viruses and that a person with the hepatitis delta will normally test positive with the hepatitis B surface antigen test, but that "always is not the case," and "a few percent ... will slip under the screening test detection line."
[6] Compare Snyder II where the donor acquired AIDS in 1986, two years after the original test. They were tested again in 1994. In those circumstances, this court was willing to draw the inference that the donors would have tested HIV-positive two years earlier had the available core testing been used in 1984.
[7] It also should be recalled that the fourth donor's blood originated in a California blood center which was not named as a defendant in this action, providing another reason why testing NJBC's donors at this late date would be even less definitive.
[8] Similar to this case, the plaintiff in Snyder I had already received the registration form of the donor, which consisted of a questionnaire and previous blood donation and vital signs at the time of the donation. All identifying information was redacted. Id. at 294, 582 A.2d 307.
[9] Dr. Francis gave even more compelling testimony on this point in our previous blood collection cases. See Doe, supra, 304 N.J.Super. at 290-92, 700 A.2d 377; Snyder II, supra, 282 N.J.Super. at 32-34, 659 A.2d 482.